JAMES R. PESCI,

        Plaintiff,

vs.                  Case No.  2:10-cv-428-FtM-36DNF

TIM BUDZ,

        Defendant.

_____

## OPINION AND ORDER

### I. Status

This matter comes before the Court upon review of Defendant Timothy Budz' Motion for Summary Judgment (Doc. #35, Motion), filed April 14, 2011. Defendant submits his own affidavit (Doc. #35-1, Exh. A), affidavit from Doctor Robin Wilson (Doc. #35-2, Exh. B), a copy of Plaintiff's Answers to Defendant's interrogatories (Doc. #35-3, Exh. C), and copies of the July 2009, August 2009, and September 2009 issues of the newsletter at issue in this case, "Duck Soup" (Doc. #35-4-#35-6, Exhs. D, E, F). Plaintiff filed a response (Doc. #40, Response) in opposition to Defendant's Motion and attaches affidavits from several residents who are also civilly confined at the Florida Civil Commitment Center. This matter is ripe for review.

Plaintiff is civilly confined to the Florida Civil Commitment Center ("FCCC"), located in Arcadia, Florida, pursuant to the Involuntary Civil Commitment of Sexually Violent Predators' and Care Act, § 394.910, *et. seq.*, Fla. Statutes (the "SVP Act").

Plaintiff initiated this action by filing a Civil Rights Complaint (Doc. #1) pursuant to 42 U.S.C. § 1983 and attached exhibit (Doc. #1-1) consisting of the April 2010 issue of "Duck Soup." *See generally* Complaint, Doc. #1-1 (refer to Court file). The Court granted Plaintiff's motion for leave to proceed *in forma pauperis* on July 21, 2010. Service of process was effectuated on Defendant Budz on August 27, 2010, and Defendant filed his Answer and Affirmative Defenses on September 27, 2010. On October 26, 2010, the Court issued its Case Management and Scheduling Order setting the following deadlines: due date of any discovery, January 14, 2011, and deadline of motions related thereto ten days thereafter; deadline for dispositive motions, April 20, 2011; deadlines for pre-trial narrative statement, June 22, 2011 for Plaintiff, and July 20, 2011 for Defendant. Doc. #15.

On November 10, 2010, Plaintiff filed a motion to extend the time for discovery by sixty days in order to adequately respond to Defendant's discovery request. *See* Doc. #16. Plaintiff submitted that Defendant requested copies of all past editions of "Duck Soup," but he could not provide Defendant with the copies because his jump drive containing the newsletters was confiscated pursuant to the FCCC's November 18, 2010 memorandum. *Id.* After reviewing the Defendant's response to Plaintiff's motion, the Court granted Plaintiff's motion to the extent that Defendant agreed to allow Plaintiff to have his jump drive temporarily for purposes of this

litigation, that Plaintiff was required to provide copies of the newsletters to Defendant within fourteen days, and required to make copies for himself only for purposes of this litigation within thirty days. Within these strict mandates, Plaintiff was then directed to return the jump drive to FCCC officials pursuant to the FCCC's November 18, 2010 memorandum. *See* Doc. #30. On April 12, 2011, Plaintiff again sought to extend discovery for a ninety-day period of time to conduct new discovery. The Court denied Plaintiff's motion, which was filed well after the deadline set forth in the Court's Case Management and Scheduling Order. *See* Doc. #47.

### a. Complaint

In this action, Plaintiff sues Defendant Timothy Budz in his individual and official capacities, alleging violations of his First and Fourteenth Amendment rights under the United States Constitution. According to the Complaint, "for years" Plaintiff published a "newsletter" called "Duck Soup" and maintained a blog online at uncomfortabletruth.org, which Plaintiff describes as "critical to the center both as to management and operational employees." Complaint at 2. Plaintiff alleges that Defendant Timothy Budz, the FCCC administrator, has interfered with his "dissemination" of "Duck Soup" by setting forth a new policy forbidding residents from copying "Duck Soup" in the computer lab. *Id.* Plaintiff claims, however, that "any form of non-copyrighted

material may be copied" in the computer lab, including newspaper articles. *Id.* Therefore, Plaintiff alleges that Defendant Budz is restricting his "freedom of the press by interfering with the dissemination of the newspaper Duck Soup." *Id.* As relief, Plaintiff seeks compensatory and punitive damages, and an order compelling Defendant to "cease and desist from interfering with the dissemination of" "Duck Soup." *Id.*

### b. Defendant Budz Motion

Defendant Budz clarifies that the FCCC policy of which Plaintiff complains prohibited all the FCCC residents' use of FCCC paper to make "hard copies" of "Duck Soup." Defendant Budz explains that the policy was effectuated to curb circulation of "Duck Soup" because it began to cause security issues at the FCCC. Defendant Budz states that the residents were allowed to print and keep hard copies of "Duck Soup," so long as they used their own paper. *See* Motion at 2-3. Defendant Budz points out that the only issue raised in the Complaint stems from Budz' policy of limiting residents' ability to copy the newsletter using FCCC paper. *Id.* at 3-4. However, since the date that Plaintiff filed his Complaint, a subsequent FCCC policy issued on November 18, 2010, bans "Duck Soup" entirely. Defendant submits that the first policy did not curb arising tensions between residents and staff at the FCCC. *Id.* at 3, 19. In analyzing both FCCC policies, Defendant Budz applies

the *Turner*[1] test and submits that FCCC residents, who are civilly detained pursuant to the SVP Act, are in a position analogous to prisoners.    Under *Turner*, Defendant Budz argues that the FCCC policy satisfies constitutional muster.

## II. Applicable Law

### A.    Motion for Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Moton v. Cowart,* 631 F.3d 1337, 1341 (11th Cir. 2011)(internal quotations and citations omitted). *See also*, Fed. R. Civ. P. 56(c)(2).  "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." *Moton*, 631 F.3d at 1341 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The standard for creating a genuine dispute of fact requires the court to "make all *reasonable* inferences in favor of the party opposing summary judgment," *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)(en banc)(emphasis added), not to make all *possible* inferences in the non-moving party's favor.

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion "bears the burden of

---

[1] *Turner v. Safley*, 482 U.S. 78 (1987).

persuasion" and must come forward with extrinsic evidence, *i.e.*, affidavits, depositions, answers to interrogatories, and/or admissions, and "set forth specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006)(citations omitted); *Celotex*, 477 U.S. at 322; *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). If there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences" must be drawn in favor of the non-moving party. *Beard*, 548 U.S. at 529 (citations omitted); *Shotz v. City of Plantation, Fl.*, 344 F.3d 1161, 1164 (11th Cir. 2003). In doing so, the Court "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. [] Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 529-30 (2006). Also, "[a] court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217

(11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In the summary judgment context, however, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008).

## B. First Amendment Rights Retained by FCCC Resident

As this is a § 1983 action, the initial inquiry must focus on the presence of two essential elements:

> (1) whether the person engaged in the conduct complained of was acting under color of state law; and (2) whether the alleged conduct deprived a person of rights, privileges or immunities guaranteed under the Constitution or laws of the United States.

*Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

Here, Plaintiff challenges a policy that was enforced at the FCCC, a facility admittedly operated by GEO, under the leadership of Defendant Timothy Budz, which has a contract with the State of Florida, specifically the Department of Children and Families, to manage the FCCC. Aff. Budz, Exh. A at 1. Plaintiff contends that the FCCC copy policy infringed on his "right to freedom of the press." Plaintiff submits that all of the residents at the FCCC were allowed to copy any material they wanted in the computer lab at the FCCC, except "Duck Soup" based on the newly implemented FCCC

policy. Complaint at 2. Consequently, liberally construing the Complaint, the Court finds that Plaintiff has articulated a violation of the First Amendment against persons acting under color of state law.

The Freedom of Speech and of the Press Clause of the First Amendment of the United States Constitution, which applies to the States through the Fourteenth Amendment, *Procunier v. Martinez*, 416 U.S. 396, 406 (1974), *over ruled in part by Thornburgh v. Abbott*, 490 U.S. 401 (1989), provides:

> Congress shall make no law . . . abridging the freedom of speech, or of the press. . . . .

U.S. Const. Amend. I. However, "First Amendment guarantees must be 'applied in light of the special characteristics of the . . . environment.'" *Martinez*, 416 U.S. at 410. While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner*, 482 U.S. at 84, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Pell v. Procunier*, 417 U.S. 817, 822 (1974)(citations omitted).

This Court is cognizant that Plaintiff is civilly committed, the FCCC is not a prison, and Plaintiff is not a prisoner. *Troville v. Venz*, 303 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has recognized that an individual who has been involuntarily civilly confined has liberty interests under the Due

-8-

Process Clause of the Fourteenth Amendment that "require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg v. Romeo*, 457 U.S. 317, 319 (1982). Thus, the Supreme Court has opined that, at least in regards to certain aspects of their confinement, civil detainees are afforded a higher standard of care than those who are criminally committed.[2] *See Id.* at 321-322; *Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir. 1996)(holding that "persons subjected to involuntary civil commitment are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). *See also Lavender v. Kearney*, 206 F. App'x 860, 863 (11th Cir. 2006).

By way of background, the State of Florida enacted the SVP Act by which a person determined to be a sexually violent predator[3] is required to be housed in a secure facility "for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person

---

[2]In *Youngberg*, the issue was whether a severely retarded young man had received proper treatment in a state facility. *Id*. at 309.

[3]A "sexually violent predator" is defined by the Act as any person who:

(a) Has been convicted of a sexually violent offense; and

(b) Suffers from a mental abnormality or personality disorder that makes the person more likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment.

Section 394.912(10), Fla. Stat. (2008).

to be at large." Fla. Stat. § 394.917(2). The SVP Act was promulgated for the dual purpose "of providing mental health treatment to sexually violent predators and protecting the public from these individuals." *Westerheide v. State*, 831 So. 2d 93, 112 (Fla. 2002)(emphasis added). In its statement of "findings and intent," the State legislature said that the SVP Act was aimed at "a small but extremely dangerous number of sexually violent predators . . . who do not have a mental disease or defect that renders them appropriate for involuntary treatment under the Baker Act (§ 394.451- § 394.4789, Fla. Stat.)." Fla. Stat. § 394.910.

Thus, Plaintiff has been civilly committed against his volition to a "secure facility" pursuant to the SVP Act upon a determination that Plaintiff meets the statutory definition of a sexually violent predator, due to his previous state conviction for a sexually violent offense. *See* Fla. Stat. § 394.910. In other words, the FCCC is a place of involuntary confinement for persons who have demonstrated a disposition for sexually deviant and violent behavior. The need to curtail potentially violent conduct is an "obligation" incumbent upon the operators of the FCCC. *Washington v. Harper*, 494 U.S. 210, 225 (1990)(stressing that the state has not only an interest, but an obligation, to combat any danger posed by a person to himself or others, especially in an environment, which "by definition is made up of persons with a

demonstrated proclivity for antisocial criminal, and often violent, conduct." (internal quotations and citations omitted)).

Staff at the FCCC face the arduous task of rendering treatment consistent with the goals of the SVP Act while ensuring the safety of not only themselves and other administrative personnel, but of all residents who are confined at the FCCC. The Supreme Court has recognized that the "interest in institutional security" and "internal security" is "paramount." *Hudson v. Palmer*, 468 U.S. 517, 528 (1984).

Although Plaintiff is not a prisoner and despite the Eleventh Circuit's cautionary language in its unpublished decision in *Marsh v. Fla. Dep't of Corrections*, 330 F. App'x 179 (11th Cir. 2009),[4] the Court finds the context in which Plaintiff is civilly detained should be afforded significant consideration in this case. Further, the Court notes that the unpublished decision in *Marsh* is only persuasive authority and is not binding precedent pursuant to Eleventh Circuit Rule 36-2. Additionally, the law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's

---

[4]While the *Marsh* Court opines that a resident at the FCCC is "arguably entitled to more protection that a criminal prisoner with regard to his First Amendment free exercise claim," *Marsh,* 330 F. App'x at 182, the opinion does not shed light on what standard would be applicable to residents who, albeit not criminals, are involuntarily committed due to their propensity to commit violent sexual acts, as opposed to having a mental disease. *See* Fla. Stat. § 394.910.

interests in institutional security and the safety of those housed at the facility. Thus, while Plaintiff, as a civilly committed resident, may not be subjected to conditions that amount to punishment, *Bell v. Wolfish*, 441 U.S. 520, 536 (1979), he nonetheless may be subjected to conditions within the bounds of professional discretion that place restrictions on his personal freedoms. *Youngberg*, 457 U.S. at 321-22; *see also Marten v. Henry*, 2010 WL 2650547 *2 (W.D. Wash. June 2, 2010)(noting that "[a] person who is the subject of involuntary civil commitment is not entitled to exercise his constitutional rights in the same manner as other citizens.").

GEO, although not the operator of a prison, is tasked with making numerous decisions and implementing policy regarding the FCCC's administration that GEO is better equipped to make than this Court. The "recognition that prison authorities are best equipped to make difficult decisions regarding prison administration" was the cornerstone of the Supreme Court's decision in adopting the reasonable relationship test. *Turner*, 482 U.S. at 84-85; *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 228 (1977); *Washington v. Harper*, 494 U.S. at 223-24. Indeed, the Third Circuit, considered the status of a SVP civilly committed resident to that of a prisoner when analyzing the institution's policies governing inspection of a resident's mail and adopting the *Turner* analysis to evaluate the resident's First Amendment rights. *See*

-12-

*Rivera v. Rogers*, 224 F. App'x 148, 151 (3d Cir. 2007)(unpublished). Additionally, another district court applied the *Turner* test when analyzing a civilly detained, sexually violent predator, plaintiff's claim that officials violated his First and Fourteenth Amendment rights by denying him permission to write, edit, publish, and distribute a newsletter. The court found the institution's security concerns were "reasonably related" to the denial of the plaintiff's ability to publish the newsletter and as a matter of law did not violate plaintiff's constitutional rights. *Bradford v. Meade*, Case No. 4:04-cv-1710CDP, 2008 WL 510387 (E.D. Mo. Feb. 22, 2008)(unpublished).

Thus, in order to properly balance Plaintiff's liberty interests against the relevant state interests and afford deference to the professional judgments of qualified FCCC staff as required by *Youngberg*, the Court finds that, in the instant case, the *Turner* standard is the proper standard to be applied in evaluating Plaintiff's First Amendment claim.[5] As the United States Supreme Court ruled "we resolve it now: when a prison regulation impinges

---

[5]"Essentially, the First Amendment analysis under *Turner* mirrors the due process analysis under *Youngberg*; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside." *Graham v. Main*, Case No. 10-5027(SRC), 2011 WL 2412998 at *13 n.11 (D.N.J. 2011)(citing *Beaulie v. Ludeman*, Case No. 07-cv-1535 (JMR/JSM), 2008 WL 2498241, at *20 n.15 (D. Minn. 2008)(finding *Turner* to be consistent with *Youngberg* because "it will not allow a Program detainee's rights to be restricted unless there is a valid institutional reason for doing so.").

on an inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

In evaluating a claim under the *Turner* test, the Court should consider the following factors: (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on facility staff, other residents and the allocation of the facility's resources generally;[6] and, (4) whether the regulation represents an "exaggerated response" to the facility's concerns. *Turner*, 482 U.S. at 89-91; *Hakim v. Hicks*, 223 F.3d 1244, 1247-48 (11th Cir. 2001).

## III. Findings of Undisputed Facts and Conclusions of Law

It is undisputed that Plaintiff, a civilly committed resident at the FCCC, published and distributed within the FCCC a monthly newsletter entitled "Duck Soup," which he was also permitted to upload online to a blog. Exh. A, Aff. Budz at 1. In "Duck Soup," Plaintiff reported on staff members of GEO and reported on FCCC

---

[6] The Court must also consider the "ripple effect" of any accommodation. *See Turner*, 482 U.S. at 90 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.")

residents. *Id.* The following are excerpts and ideas that Plaintiff articulated in "Duck Soup":

> "Quite frankly, it's like the whole facility is one great big game board and we, the inmates, are merely the pieces." (*See* July 2009 edition, pp. 2, Exh. D).

> Insinuating that FCCC residents should be holding "collective protests" and "demonstrations," and that they are "cowards" for not. Asking a rhetorical question as to "[w]here are all the soldiers" that are quick to fight other residents. (Exh. D. at pp. 2-3)

> Reporting two deaths of FCCC residents and suggesting the causes of death were "suspect" and should be investigated (Exh. D. at pp. 16-18).

> Suggesting that if you are not like-minded with Plaintiff and believe that GEO and the Department of Children and Families are a "white collared, criminal enterprise" then "you are one of my foolish readers." (*See* August 2009 edition, Exh. E at pp. 2-7).

> Writing about staff who sympathized with the FCCC residents and quoting a resigning nurse who stated "that she knows how 'unfair this whole Jimmy Ryce Act thing truly is for you guys.'" (Exh. E. at 13-14)

> Degrading another FCCC resident who contributes to another newsletter that resident publishes called "The Voice" by stating, among other things, that the resident publisher is a "sell out," who "also likes to tap dance for the facility administration and clinicians," and that "The Voice" contains no truth, whereas "Duck Soup" is the "uncensored pulse of the compound." (Exh. E. at 18-19).

> Encouraging FCCC staff to file lawsuits against GEO (Exh. E. at 22-23).

> Generally "making fun" of the FCCC's treatment program. Specifically, referring to the FCCC treatment program as a "so-called" treatment program and opining that Plaintiff has refused treatment because he is not guilty of the sex crime. (September 2009 edition, Exh. F at 2-3).

Stating "if [the FCCC] could not take care of [a dog named Buster], what in God's name makes you clowns [the FCCC] feel that you can take care of us?" (Exh. F. at 6.)

Insinuating that the FCCC is like "Gitmo." (Exh. F at 8)

Stating "[b]ecause I have every intention of hitting a lot of nerves in this month's edition." (*See* July 2009 edition of "Duck Soup," pp. 4-5, Exh. D)

Accusing Budz of using illegal drugs. (Exh. D, at 4-5)

Stating that a particular lieutenant likes watching other residents shower (Exh. D at 15-16)

Accusing FCCC medical staff of causing the death of a resident. (Exh. D. at 16-18)

The GEO's president meets the criteria to be indicted. (*See* August 2009 edition of "Duck Soup," pp. 2-3, Exh. E)

That, according to "sources," medical administrators write less than satisfactory evaluations on other nursing staff in order to deny them shift privileges. (Exh. E at 11)

That, according to a "source," a particular GEO nurse was being targeted for unfair harassment. (Exh. E at 16)

That a GEO doctor was walked off the compound due to spending too much money for resident medical care (Exh. F at 15)

Suggesting an FCCC resident's death, or serious bodily injury, at the hands of a particular correctional official, who supposedly used excessive force on the FCCC resident, who was attempting either suicide or self-mutilation, (*See* April 2010 edition, at 18-19, Doc. #1-1).

Reporting about a story involving a transport officer who purportedly stopped mid-transport with an FCCC resident to pick-up his personal vehicle thereby leaving the other transport officer weaponless (Doc. #1-1 at 20-21).

> Discussing the hostilities Plaintiff encountered from some staff in the medical department after publishing an edition of "Duck Soup" that "exposed" the medical department. (Exh. F at 12-13).

Based upon the record, Defendant Budz implemented the April 2009 policy at the FCCC because "Duck Soup" interfered with the orderly running of the FCCC.[7]

Although Plaintiff states that he brings this action against Defendant Budz in both his individual and official capacities, it is clear that the Complaint concerns only the April 2009 policy set forth by Defendant Budz, in his official capacity. The Complaint contains no allegations attributing liability to Defendant Budz in his individual capacity. Therefore, the Court will treat this action as one brought against Defendant Budz in only his official capacity based on the April 2009 policy restricting the unrestricted copying of "Duck Soup."

The Court now looks to *Turner* for guidance on analyzing this matter. According to the first factor set forth in *Turner* , "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. at 586). "[T]he governmental objective must be a

---

[7]In November 2010, Defendant Budz replaced the April 2009 policy with a rule that deemed "Duck Soup" contraband. The November 2010 policy is not at issue in this action because the Complaint has not been amended. *See* Exh. C., Pl's Answers to Interrogatories at 1. Thus, the Court only addresses the FCCC's April 2009 policy in this action.

legitimate and neutral one." *Turner*, 482 U.S. at 90. The Supreme Court found "it important to inquire whether the prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Turner*, at 90 (citing *Pell v. Procunier*, 417 U.S. at 828; *Bell v. Wolfish*, 441 U.S. at 551).

Defendant Budz provides justification for implementing the April 2009 policy at the FCCC based on the security concerns that "Duck Soup" began to raise at the FCCC. Defendant Budz submits that both staff members and residents complained to him about the distribution of "Duck Soup" and its contents, and that the Plaintiff's blog was creating a "hostile environment" among residents and staff at the FCCC. *Id.* Defendant Budz presents evidence from the Clinical Director of the FCCC, Doctor Robin Wilson, who attests that Plaintiff's "Duck Soup" interfered with treatment at the FCCC in that the FCCC residents were becoming more combative with staff and were becoming more resistant to treatment. *See generally* Exh. B, Aff. Dr. Robin Wilson at 2-3. Thus, in August 2009 Defendant Budz enacted the policy that residents would no longer be permitted to make hard copies of "Duck Soup" at the FCCC computer lab using FCCC paper, in order to limit the circulation of "Duck Soup" at the FCCC.[8] Exh. A, Aff. Budz at 2-3.

_____

[8]The April 2009 policy continued to allow staff to view the blog online and continued to allow residents to make hard copies of

(continued...)

The Court determines that the April 2009 policy was rationally related to the FCCC's objective, and that the policy was legitimate. The FCCC regulation forbids the use of FCCC computer lab paper for all "Duck Soup" newsletters to limit its circulation amongst FCCC residents and staff because the publication was creating a hostile environment at the FCCC and therefore was logically deemed detrimental to security. The April 2009 FCCC regulation turned, to some extent, on the content of the newsletter, "[b]ut the Court's reference to 'neutrality' in *Turner* was intended to go no further than its requirement in *Martinez* that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415–416. Thus, like in *Thornburgh*, the FCCC regulation at issue *sub judice* is neutral in the "technical sense" that the regulation was implemented as to "Duck Soup" because of its impact on security. *See also Jones v. North Carolina Prisoners's Labor Union*, 433 U.S. 119, 134 (1977)(upholding a content-based restriction, where internal distribution of union materials in a prison was prohibited while distribution of materials from Jaycees and Alcoholics Anonymous was permitted because the union newsletter did not serve a

---

[8](...continued)
"Duck Soup," if they used their own paper. Exh. A, Aff. Budz at 2. During the pendency of this action, Plaintiff continued to publish "Duck Soup."

rehabilitative purpose, or work in harmony with the goals and desires of the prison administrators. Prison officials needed to only demonstrate a rational basis for their distinctions between organizational groups.); *contra Procunier v. Martinez*, 416 U.S. 396, *over ruled in part*, *Thornburgh*, 490 U.S. 401 (applying strict scrutiny standard and finding prison policy that censored inmates' outgoing mail was a content-based restriction in violation of the First Amendment).

The Court will now address the second *Turner* factor, whether there are alternative means that remain open to FCCC residents. *Turner*, 482 U.S. at 90. "Where 'other avenues' remain available for the exercise of the asserted right, . . . courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Turner*, 482 U.S. 90 (internal citations omitted).

Here, the Court finds that there were other means for the FCCC residents to have access to "Duck Soup." Although Plaintiff's right to circulate "Duck Soup" was arguably limited by the April 2009 FCCC policy, employees and residents were still able to view "Duck Soup" online and residents, who had their own paper, could choose to make hard copies of "Duck Soup." Additionally, Plaintiff acknowledges that other reading materials are available to FCCC residents.

Turning to the third *Turner* factor, the Court finds that accommodating Plaintiff's request to allow unlimited printing of "Duck Soup" on FCCC paper in the computer lab, and therefore accommodating widespread circulation of "Duck Soup," had a significant impact on FCCC officials and on FCCC residents. Defendant Budz and Doctor Wilson submit that "Duck Soup" was disruptive to the operation, safety, security, and treatment at the FCCC. Exh. A, Aff. Budz at 3; Exh. B, Aff. Wilson at 2-3. Defendant Budz submits that "Duck Soup" created a hostile work environment for FCCC employees because the newsletter undermined the authority of those in charge of the FCCC. *See generally* Exh. A, Aff. Budz; Exh. B, Aff. Dr. Wilson. Defendant Budz also presents evidence that widespread circulation of "Duck Soup" was hampering the treatment process for FCCC residents because "Duck Soup" portrayed the treatment process as a joke. *See* Exh. B, Aff. Dr. Wilson; *see also supra* at 15-17. Additionally, Doctor Robin Wilson submits that FCCC residents, who wanted to pursue treatment, were often unwilling to share their thoughts or information about themselves during group therapy for fear that Plaintiff would publish what they said. Exh. B, Aff. Dr. Robin Wilson at 2.

The FCCC's April 2009 policy also satisfies the fourth *Turner* factor, *i.e.*, whether the regulation represents an exaggerated response to prison concerns and the existence of a ready alternative. Plaintiff does not offer an alternative to the April

2009 regulation, nor does he argue that the regulation was an exaggerated response.  And, Defendant Budz is not obligated to demonstrate that the April 2009 policy was the "least restrictive alternative."  *Turner*, 482 U.S. at 90.  As discussed *supra*, Defendant Budz had reasonable security concerns and implemented the April 2009 policy to limit circulation of "Duck Soup."  At that point in time, FCCC residents and employees could still view "Duck Soup" and print copies, provided the resident had his own paper.  Therefore, the April 2009 policy was not an exaggerated response to the problem at hand.  In fact, the record shows that Defendant Budz implemented the April 2009 policy as a first course of action, before deciding to totally ban "Duck Soup" some 18 months later because the April 2009 policy did not result with the desired change in the environment at the FCCC.[9]

In opposition to the affidavits of Doctor Wilson and Defendant Budz, Plaintiff presents affidavits from some FCCC residents who submit *inter alia* that: they enjoyed reading "Duck Soup," "Duck

---

[9]Defendant Budz presents additional evidence that the August 2009 paper policy did not have the desired change on the environment at the FCCC and "Duck Soup" "became increasingly inflammatory, degrading and demeaning toward FCCC staff and administration."  Exh. A, Aff. Budz at 2; *see also* Exh. B, Aff. Dr. Robin Wilson at 3.  Therefore, on November 18 2010, Defendant Budz issued a memorandum deeming "Duck Soup" contraband as a result of security concerns.  Exh. A, Aff. Budz at 2; Exh. B. Aff. Dr. Wilson at 2-3.  Doctor Wilson opines that "the effectiveness of the treatment program has returned to normal since Mr. Budz banned the newsletter entirely on November 19, 2010."  Exh. B, Aff. Dr. Robin Wilson at 3.

Soup" did not make them hostile, and they personally did not feel unable to share during group therapy because of "Duck Soup." *See generally* Pl's Exhs A-K. Coincidently, as discussed *supra*, "Duck Soup" contains evidence that Plaintiff himself experienced some hostility from staff at the FCCC as a result of "Duck Soup" and Plaintiff in fact expressed hostilities to other FCCC residents who did not agree with his point of view and participated in the treatment program at the FCCC. *See supra* at 15-17. Therefore, the evidence Plaintiff submits that "Duck Soup" did not pose a security concern at the FCCC is insufficient to overcome the record evidence and the reasonable views of the FCCC officials that "Duck Soup" posed a security risk. This Court must afford deference to the FCCC officials' professional judgment on this matter. As noted by the Supreme Court in *Turner*, "judgments regarding prison security 'are peculiarly within the province and professional expertise of correctional officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Turner*, 482 U.S. at 86 (quoting *Pell*, 417 U.S. at 827). Based on the foregoing, the Court finds that Defendant Budz is entitled to judgment as a matter of law and that the FCCC's policy did not violate Plaintiff's rights protected under either the First, and/or the Fourteenth Amendment.

ACCORDINGLY, it is hereby

**ORDERED**:

1.   Defendant's Motion for Summary Judgment (Doc. #35) is **GRANTED** and this case is dismissed with prejudice.

2.   The **Clerk of Court** shall terminate any pending motions, enter judgment accordingly, and close this case.

**DONE AND ORDERED** at Fort Myers, Florida, on this 8th day of February, 2012.

Charlene Edwards Honeywell
United States District Judge

SA: alj

Copies: All Parties of Record